TED W. CASSMAN (SBN 98932)
LAUREL L. HEADLEY (SBN 152306)
ARGUEDAS, CASSMAN & HEADLEY, LLP
803 Hearst Avenue
Berkeley, California 94710
Telephone: (510) 845-3000

Attorneys for Defendant
DIALLO MCLINN

IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND VENUE

| UNITED STATES OF AMERICA, | NO. CR 08-0099 WDB |
|---|---|
| Plaintiff, | DEFENDANT DIALLO MCLINN'S SENTENCING MEMORANDUM |
| vs. | |
| DIALLO MCLINN, | |
| _____ Defendant. / | |

**INTRODUCTION**

Defendant DIALLO MCLINN stands before the Court, having pleaded

guilty to a misdemeanor violation of aiding and abetting the possession of marijuana, in

violation of 21 U.S.C. §§ 2 and 844.  The parties waived a presentence report.  The

parties agree that the sentencing guidelines are a level two, with a sentencing range of

0 to 6 months.  For the reasons set forth in this sentencing memorandum, MCLINN

hereby requests that the Court impose a probationary sentence with no custodial term.

**BACKGROUND**

Diallo is 36 years old.  He has no previous convictions, state or federal.

An artist, he is a kind and gentle, if immature and naive, young man who contributes

positively to the lives of those he touches, as demonstrated by the numerous letters of

TED W. CASSMAN (SBN 98932)
LAUREL L. HEADLEY (SBN 152306)
ARGUEDAS, CASSMAN & HEADLEY, LLP
803 Hearst Avenue
Berkeley, California 94710
Telephone: (510) 845-3000

Attorneys for Defendant
DIALLO MCLINN

IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND VENUE

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. CR 08-0099 WDB |
| Plaintiff, | DEFENDANT DIALLO MCLINN'S SENTENCING MEMORANDUM |
| vs. | |
| DIALLO MCLINN, | |
| _____ Defendant. / | |

## INTRODUCTION

Defendant DIALLO MCLINN stands before the Court, having pleaded guilty to a misdemeanor violation of aiding and abetting the possession of marijuana, in violation of 21 U.S.C. §§ 2 and 844.  The parties waived a presentence report.  The parties agree that the sentencing guidelines are a level two, with a sentencing range of 0 to 6 months.  For the reasons set forth in this sentencing memorandum, MCLINN hereby requests that the Court impose a probationary sentence with no custodial term.

## BACKGROUND

Diallo is 36 years old.  He has no previous convictions, state or federal. An artist, he is a kind and gentle, if immature and naive, young man who contributes positively to the lives of those he touches, as demonstrated by the numerous letters of

1    support submitted on his behalf.  (Exhibit A.)

2            Diallo's childhood was marked by abuse and tragedy.  His mother, Arisika

3    Razak, met his father in Africa in 1971.  Upon returning to the States, they had a brief

4    relationship but never married.  Before Diallo's birth, Ms. Razak moved to California

5    where she joined an informal commune and entered into a relationship with Jamy

6    Sheridan.  When Diallo was 8 months old, Ms. Razak went on a short business trip and

7    left Diallo in Sheridan's care.  While away, Ms. Razak received a phone call that Diallo

8    was hospitalized and  suffering severe seizures.  In fact, Diallo sustained severe brain

9    injuries and other  trauma including a broken ulna and radius on the left forearm, "left

10   retinal hemorrhages, left ptosis, bilateral clonus, right facial paralysis and hypereflexia

11   with bilateral Babinskis."  (Exhibit B, Clinical Summary, Children's Hospital Medical

12   Center.)  Sheridan denied abuse, and a formal finding was never made, but that

13   conclusion is obvious.  Doctors performed surgery, including bilateral subdural taps,

14   relieving the paralysis on Diallo's right side.  (Exhibit B.)  As a result of the trauma Diallo

15   sustained brain and cognitive deficits that delayed his physical and mental development

16   and will affect him for the rest of his life.  (Exhibit C, Report of Elea Bernou, Psy.D.)[1]

17            Through his early childhood and teenage years, Diallo sustained

18   additional injuries and setbacks, arising at least in part from his physical deficits and

19   impulsivity.  These events contributed to his feelings of "loss and isolation."  (Exhibit C

20   at 6.)  Certainly such feelings were exacerbated when, during his high school years,

21   Diallo's Aunt shot and killed his grandmother in her own home.  In a strange twist, Diallo

22   at age 17 moved into his deceased grandmother's home and lived there with

23   roommates who rented from him, to help save the home from repossession.  (Exhibit C

24   at 7.)

25   _____

26            [1]The psychological report of Dr. Bernou will be submitted separately with a
     request that it be filed under seal.

In high school and later college, Diallo generally received C's and B's, with some lower grades from time to time, especially in history and foreign language. (Exhibit C at 6.)  By high school, it was clear that Diallo had an affinity for visual arts, especially photography, video and computer graphic arts.  (Exhibit C at 7.)  For years he pursued an A.A. degree from California College of Arts & Crafts and eventually was permitted to "graduate" in the school's ceremony, even though it turned out that he was still missing two necessary courses.   During this time, Diallo supported himself, barely, with various odd jobs.

In 1993, Diallo had a relationship with a young woman that resulted in the birth of a baby girl.  Difficulties with the young mother lead to the child's placement in foster care.  Diallo and his mother followed the situation closely, and his daughter was ultimately adopted by a couple who were and remain family friends.  Happily, she was taken in a by family who were friends, and Diallo has maintained a relationship with his daughter, Amber, who is now 13 years old.  Generally, Diallo's relationships with others, both romantic and otherwise, are marked by dependency and passivity.  As Dr. Bernou explains:

> In summary, Mr. McLinn is a caring young man with a history of trauma, repeated significant losses, physical and emotional abuse, head injury, and residual cognitive difficulties, who evidences the characteristics of a Dependent Personality.  His mother and the family social worker have noted that [Diallo] is immature in specific ways and shows low self-esteem. Although he is caring, kind, generous, and compassionate, he often evidences poor judgment in terms of relationships (friendships and love relationships), demonstrates a prominent defensive style – making use of denial/rationalization around negative situations and acts, and avoids strong – especially negative – affective stimulation.

(Exhibit C at 10.)

One source of strength and stability for Diallo has been his mother's marriage to Osha Neumann,l an attorney in Berkeley.  Mr. Neumann has taken a very

3

active, supportive and positive role in Diallo's life.  Mr. Neummann provides similar

insights to Diallo:

> [Diallo has struggled through a series of low-paying service jobs, waiting tables, working in the stock room of a printing company; doing little freelance graphic design.  He's gone through periods where his phone is turned off for lack of payment and periods of homelessness.  He has been victimized by people he thought were his friends and believed in their moneymaking schemes that ended up going bust.  Because he does not trust his own judgment he seeks out people whom he thinks know better than he how the world works and relies on them.

. . . [¶] . . .

> Diallo is not simply a wounded victim.  I absolutely do not want to give that impression.  He is a sweet, kind, gentle, guileless human being.  He is absolutely without a trace of meanness.  He is an artist, who has spent hours since he began living with us in September perfecting his skills at computer graphics.  True to his nature, he is generous in sharing his skills.  He has given many hours to an organization in San Francisco that helps the homeless and women on welfare publish their memoirs, poems, and short stories.

(Exhibit D, letter of Osha Neumann.)

Diallo's mother has consistently provided another solid source of strength

and support.  Throughout all of his difficulties as a young child, teenager and young

adult, Arisika has been there for Diallo, with love and guidance.  Regarding the current

ordeal – Diallo's arrest and the potential for incarceration, she writes:

> I feel that I now know more about the complex person who my son is. He is a *good* person. He is not self-centered or narcissistic; he cares deeply about people and he wants to make a contribution to the world. He is deeply committed to Amber, his fourteen year old daughter who is in an open adoption arrangement. While Amber has not seen her mother since she was one year old, she has grown up knowing that Diallo is part of her life. He is in contact with her once or twice or week; and he takes her out three to four times a month. Last year they went to New York together to visit with his biological father's family. When he considered the prospect of incarceration, he indicated that separation from his daughter would be a great loss to him.

(Exhibit E, letter of Arisika Razak.)

Since his arrest in September, Diallo has resided at the home of his mother and Osha Neumann as a condition of pretrial release. While it is, of course, important that Diallo regain his independence and self-reliance, this nurturing and supportive environment has been a positive development. Over these six months, Diallo has complied with every requirement of pretrial services.

The bottom line: Diallo is a charming, immature man who continues to "struggle with the residual impact of the severe head injury he sustained as an infant." (Exhibit C at 16.) Additionally, he "has developed a Dependent Personality Disorder." (Exhibit C at 16.) Dr. Bernou concludes as follows:

> In combination, his cognitive impairments and Dependent Personality Disorder have made him vulnerable to making poor choices, and to becoming and staying involved in relationships where he is used and hurt by others – but where he receives enough positive feedback and/or love to stay engaged. He is not a danger to society – in fact, he is a caring person who demonstrates much positive regard for others. In addition, he has demonstrated that he is a responsible individual when it comes to long term commitments to family members – such as his daughter.

(Exhibit C at 16.)

### The Offense

During the course of the government's investigation, Diallo was identified as an individual who was present on several occasions at the operations locations of Tainted Treats. With very limited involvement, Diallo assisted the more responsible parties in the possession of marijuana. He was not involved in the production or distribution of the marijuana. He understands that it was wrong for him to be involved at all and acknowledges his responsibility for his bad judgment. His conduct is entirely consistent with Dr. Bernou's evaluation and diagnosis.

**ARGUMENT**

The U.S. Sentencing Guidelines are, of course, no longer mandatory, but instead provide a "starting point" for the Court's sentencing determination. *Gall v. United States*, 552 U.S. ___, 128 S.Ct. 586, 596 (2007); *accord Cunningham v. California*, 549 U.S. ___, 127 S.Ct. 856, 867 (2007). District courts must consider the Guidelines, but should "tailor the sentence in light of other statutory concerns, as well." *Kimbrough v. United States*, 552 U.S. ___, 128 S. Ct. 558, 570 (2007). Specifically, courts must determine the appropriate sentence by considering all of the factors set forth in 18 U.S.C.§ 3553(a). *Gall*, 128 S.Ct. at 596.

18 U.S.C.§ 3553(a) makes clear that the appropriate sentence is one that is "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2" of Section 3553(a). 18 U.S.C. § 3553(a). These purposes include: the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment for the offense; the need for the sentence imposed to protect the public from further crimes of the defendant; and the kinds of sentences available. 18 U.S.C. § 3553(a)(2).

Taking the §3553(a) factors into consideration, we submit that a sentence of probation, without any custodial term, is appropriate. First, the sentencing guideline range is a level two – with a range of zero to six months. Clearly, the guidelines indicate probation and a relatively lenient sentence. Second, the §3553(a) factors lend powerful support to a non-custodial sentence. Regarding the nature and circumstances of the offense, it is misdemeanor possession of marijuana. Regarding the history and characteristics of the defendant, Diallo has no prior record. Moreover, his involvement in this offense was obviously minimal and readily explained by his sweet, trusting, immature and naive nature. He is by all accounts a loyal, kind and responsible person.

1   But his Dependent Personality Disorder, in combination with his brain deficits, has

2   made him vulnerable to the overtures and influence of people who are not concerned

3   about him and who have and will use him for their own selfish purposes.  Finally, with

4   regard to deterrence, Diallo has proved that he has learned an important  lesson.  He

5   has discontinued his casual use of marijuana and complied with all of the requirements

6   of pretrial services.  As to general deterrence, for all of the reasons set forth above, a

7   custodial sentence is unnecessary to send any message to others.  Given Diallo's

8   minimal involvement and unique personal history, there is no reasonable possibility that

9   others will misconstrue a non-custodial sentence as an invitation to engage in similar

10  behavior.

11          Accordingly, and for all of the reasons set forth above, the Court should

12  place Diallo on probation, with special conditions that he participate in therapy and

13  counseling as directed by the probation department.

14  Dated: April 2, 2008                    ARGUEDAS, CASSMAN & HEADLEY, LLP

15

16                          _____/s/_____
                            Ted W. Cassman, attorney
17                          for defendant Diallo McLinn

18

19

20

21

22

23

24

25

26

1 TED W. CASSMAN (SBN 98932)
LAUREL L. HEADLEY (SBN 152306)
2 ARGUEDAS, CASSMAN & HEADLEY, LLP
803 Hearst Avenue
3 Berkeley, California 94710
Telephone: (510) 845-3000
4
Attorneys for Defendant
5 DIALLO MCLINN

6

7           IN THE DISTRICT COURT OF THE UNITED STATES

8           FOR THE NORTHERN DISTRICT OF CALIFORNIA

9                      OAKLAND VENUE

10 UNITED STATES OF AMERICA,                    NO. CR 08-0099 WDB

11              Plaintiff,

12 vs.

13 DIALLO MCLINN,

14 _____ Defendant. /

15

16

17      **EXHIBITS A, B, D AND E TO DEFENDANT MCLINN'S**

18              **SENTENCING MEMORANDUM**

19

20

21

22

23

24

25

26

# EXHIBIT A

LAW OFFICES OF CHARLES A. BONNER

1913 Bridgeway
Sausalito, CA 94965

———

Tel: (415) 331-3070
FAX (415) 331-2738

March 31, 2008

**FILED**

APR 2 - 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

Hon. Judge Wayne D. Brazil
Oakland Federal Building
1301 Clay Street, Room 400 South Tower
Oakland, California 94612-5212

RE:    CR-08-00099-CW (WDB)
United States v. Diallo McLinn Case No: 4-07-MJ-70574 WDB
United States District Court, Northern District California

Dear Hon Judge Brazil:

I am writing this letter to plead for leniency in the sentencing of Diallo McLinn. My name is A. Cabral Bonner. I am an a newly licensed attorney, practicing with my father Charles Bonner, in Sausalito California.

I have known Diallo for most of my life. My earliest memories of him go back to when we were both in elementary school. Our parents' friendship goes back to before Diallo and I were born. Diallo is a few years older than me and we never went to the same school but our friendship was and is strong.

I understand the facts of Diallo's case. His family came to our office immediately after Diallo was arrested. When I first heard of his involvement I was shocked because I know Diallo to be a respectful and law abiding individual. The situation only made sense to me when Diallo explained that his primary involvement was doing graphic design and art work.

I also know that Diallo has pled to a misdemeanor of aiding and abetting the possession of marijuana. I am sure from dealing with Diallo before this incident and helping him after his arrest, that this incident has had a profound impact on him. Should Your Honor show him leniency I have no doubt that he will do everything in his power to conduct himself in a law-abiding way and to fulfil any and all conditions placed upon him.

Diallo is a smart and capable individual. He is a committed father and friend. He is a gifted photographer and graphic artist. Diallo has a strong family and community support network in the Bay Area. He is young and has a lot to offer his community. The bio page of Poor News Network and POOR Magazine give the best description of Diallo:

Diallo McLinn is a Oakland based digital artist. He specializes in Visual design. Diallo's interest is art, not money. This enables him to work on heart felt projects, not corporate burn-out projects. Son of mid-wife, teacher, and spiritual dancer,

Arisika Razak, Diallo uses his art to promote positive change.

Your Honor, in this particular case, justice will best be served by using your discretion to grant maximum leniency to Diallo McLinn.

Very truly yours,

**LAW OFFICES OF BONNER AND BONNER**

A. CABRAL BONNER



March 16, 2008

Magistrate Judge Wayne D. Brazil
United States District Court
1301 Clay Street
Oakland, CA 94601

        Re:    Diallo McLinn
        Case #:  07-70574

Dear Honorable Judge Brazil:

I am writing on behalf of my cousin, Diallo Mc Linn.

I am aware that my cousin Diallo has pleaded guilty to aiding and abetting in the
possession of marijuana.  The news of his arrest shocked our family.  Though I am aware
that Diallo has pleaded guilty, probation would give him a jump start on being a positive
asset to society.

Diallo is my first cousin and we have grown up together.  I admit that he has made a
mistake, but the embarrassment that he has caused, along with probation is punishment
enough.

Diallo is a kind and gentle person.  He is a loving father to his daughter Amber.  Though
she was formally adopted by another family, he is still actively involved in her life. He
and I have attended her soccer games and dance performances.  If Diallo is sentenced to
jail, Amber will have her father taken away.

Please take into consideration when sentencing that Diallo is a man that lost his way and
made a wrong decision. He is prepared to make the right choices in the future and we his
family are making the commitment to help him.

Sincerely,

Yolanda Allen-Hill

Yolanda Allen-Hill

March 19, 2008

Magistrate Judge Wayne D. Brazil
United States District Court
1301 Clay Street
Oakland, CA 94601

 Dear Honorable Judge Brazil:

I am writing to you on behalf of my nephew, Diallo McLinn. I am his Aunt.

I am aware he is pleading guilty to a misdemeanor of aiding and abetting in the possession of marijuana. I was thoroughly shocked and saddened to hear of his involvement in this case. However, I feel he would benefit by being on probation and not in jail.

 Diallo McLinn had outer brain surgery performed as an infant after falling and going into convulsions. I don't know if this contributed to any defects in his cognitive/academic development. We will never know if he could have made more progress in employment and academic achievement.

 Since 1994, he has worked for different catering companies. In addition, he worked for approximately two years at PS Sprint in Emeryville, CA.  He has contributed to society and will continue to do so.

He was diagnosed with dyslexia as a child, but was determined to achieve his fine arts degree from the California College of Arts and Crafts.  He is short two classes towards obtaining his B.F.A. degree.

While attending classes, he honed his skills as a videographer and over the years videotaped fashion shows, and used his web skills to assist people in developing their web pages.

 I am making a plea for you to be lenient on my nephew, Diallo McLinn.

 Sincerely,

Paula Boaz
Diallo McLinn's Aunt

March 11, 2008

To whom it may concern.

I have been a friend of Aisika Razak for over thirty years and I met Diallo on the day he was born. I have known him all of his life and watched him grow from a sweet and somewhat mischievous child into a sensitive, thoughtful and committed young man.

With Aisika as his mother, Diallo has been given a unique view of women's Spirituality. He has a special gift as a video artist and he communicates his vision to the world through video and film.

I am a spoken word performer and dancer whose work has been videoed and edited by Diallo and I believe

Diallo to be a valuable artist who is able to bridge the generational and gender divide with his work. I am hoping to engage his services for my 70th birthday and I hope to have him produce a CD that celebrates my work as an artist, performer and athlete.

It is rare to find the kind of gifts that Diallo has among young men—particularly young Black men. The community needs this kind of Spiritual vision that Diallo's film work provides and I encourage you to support his being able to be out in the community to do this much needed work.

Sincerely,

Barbara Thomas



**BLUE HERON**
*Catering, l.l.c.*

January 23, 2008

Arguedas, Cassman and Headley, LLP
Laurel L. Headley Law Offices
headley@achlaw.com

To Whom It May Concern:

We are the owners of Blue Heron Catering and Royal Raspberry Catering, both in Oakland, California.
Diallo McLinn has been our employee since 1997. Diallo approached us for work when we opened a café
at a local art college, where he was a student. We immediately felt a good rapport with him and he
continues working for us presently. Diallo was a dedicated student, always involved in creative art
happenings at the college and he was very interested in working in the food industry.

Recently, we learned that Diallo was involved in a misdemeanor charge of aiding and abetting the
possession of marijuana. This news was a complete surprise to all of us as we have never known Diallo to
be anything but a law abiding citizen or cause any trouble.

Diallo has always been a loyal, dedicated, hard worker for our company. We consistently ask him to work
our events because we trust him with our company image and we feel he has integrity. Diallo has always
abided by the procedures set forth by our company and has always been polite and pleasant to all of our
customers and our staff. He is a joy to work with.

We would like to see Diallo have a chance to prove he is a positive influence on those around him in his
work and his everyday life. We hope that you will consider all of this when making a decision about
Diallo's situation.

Thank you.

Sincerely,

Deborah Pfisterer, President

Elizabeth Fazzio, Vice President

*Personal attention to your event*
510-428-0781 · Fax: 510-428-0793

Law Offices                                    October 29, 2008
803 Hearst Avenue
Berkeley, Ca 94710
Att.: Ted W. Cassman

Re:   Diallo McLinn

It is with great pleasure that I write this letter to you on behalf of
Diallo McLinn, who I came to know when I became a housemate
At 514 62nd Street in Oakland.  I have known him since January,
1999 which is when I took up residence there.  At that time Diallo was
in his final two years at The California College of Arts and Crafts.
I cannot at this time recall what year he graduated from there.
As I came to know Diallo I was extremely impressed with his con-
sistent optimism and friendliness.  Regardless of what was happen-
ing locally, nationally or globally there always seemed to be some-
thing to smile about.  It was when he began to look for employment
in his field as a graphic artist that I began to see and realize his
core essence.  No jobs were available for this young man of ex-
ceptional talent.  Yet his response to my inquiries regarding job
hunting were always, "Something's going to open us for me."  I
noticed at times a moment of hesitation but his response never failed
to be upbeat and hopeful.  I would like to recount a moment in parti-
cular that stands out.
One day I suggested that he check out Lucas Films thinking that perhaps
he might know someone who had a connection with them that could
give him a contact.  He followed up on that suggestion  and some time
passed when I finally asked about Lucas Films.  I was somewhat
shocked when he told me of the 2000 artist employees (at that time)
only 14 were non-Euro-American.  This moment stands out because
Diallo gave no energy to the obvious racism he had encountered and
just let it go at that.  It is this kind of on-going maturing that sets him
apart to those of us who know him.  He is willing to take the higher
ground by not giving in to the cynicism and hopelessness that so
easily comes up in times like this.  On this quality alone the court
would do well to consider dropping all charges and clearing his name.  This
is a person whose deepest belief is that there is only one human race   and
though some of us are flawed, compassion and withholding  judge-
ment is the only path to walk especially at this time on earth.
In closing I ask you to put all your expertise and effort to clear
Diallo McLinn of all charges, making sure that all legal steps are
taken so that he can walk out of court totally free and continue to
live his life with the kind of vibrant integrity unique to him.

                    Respectfully,

                    Olivia Quevedo

**Ed Harris - F.F.S. Company - P.O. Box 21247, Oakland, California 94620**

March 24, 2008

Dear Sir:

I have known Diallo McLinn for a number of years now, in both a family and business capacity.

I have found Diallo McLinn to be very upstanding and respectful to family, friends, and acquaintances.  Mr. McLinn comes from a very good family that emphasizes respect for law and community.

I have referred Diallo McLinn to my business contemporaries and friends.  I have gotten back only positive feedback about his work and social ethic.

Please rule favorably on Diallo McLinn's future because I feel that his contributions to society will be positive from now on.

Thank you for your consideration in this life altering matter.

Edward D. Harris

DATE:       March 24, 2008

TO:         Presiding Judge Brazil

FROM:       Teloca McLinn

RE:         Letter Of Recommendation On Behalf Of Diallo McLinn

I am writing this letter on behalf of my nephew, Mr. Diallo McLinn, who I have known since birth.

As his aunt, I have had a chance to spend time with him in many different situations and through many different circumstances - both personal and family.

As he goes before you in court - I want you to know that I and the rest of his family stand behind him in terms of his intent. Diallo McLinn produces excellent work in any job in which he challenges his knowledge and skills. He is an honest, open, friendly person who takes his work seriously and uses all of his skills to complete his tasks in a most interesting and artistic manner. He is not and has never been interested in participating in illegal activities and endeavors.

Diallo McLinn's college training in the College of Arts and Crafts, in which he holds a degree, has allowed his natural artistic talents to overflow and intermingle into his computer talents. He has also chosen to also work in catering when necessary, in order to obtain the funds needed to continue to pursue his dreams as he works his way towards the permanent job or independent business of his choice.

Diallo McLinn was born in California. He is a Berkeley man, having lived in the Oakland/Berkeley area for all of his life. His mother continues to live in Berkeley, and he has many other relatives in the area, including myself.

I say all of this, in order to point out that Diallo McLinn works with only the best intentions and integrity. I seriously believe that he would never purposely participate in any activity which he did not believe to be an honest and legal endeavor. Therefore, any particular job he has held has been within the realm of his training and knowledge, for the purposes of remuneration, and with the understanding that it is legitimate.

Please take these factors into consideration when presented with the case of Diallo McLinn and remember that he has never been in a position to run the operations of any company or of any part of any company.

Please give Diallo McLinn the opportunity to find his place in his life. Please be compassionate and understanding when looking at his actual role as an employee - so that you can seriously consider the idea of throwing this case out, especially when faced with lack of hard evidence.

March 21, 2008

To whom it may it concern,

I am Juliana Miller. I have been Diallo Mclinn's friend and girlfriend since October of 2003. I am a senior at Humboldt State University and graduating this year. I am aware that Diallo has pled to misdemeanor aiding and abetting the possession of marijuana. Diallo has full respect for the law and will be a law abiding citizen who contributes positively to the community he lives in. I am confident that he will perform well on probation, fulfill all of his conditions and follow the terms set by the courts.

Diallo Mclinn has taught homeless people how to use computer programs at Poor Magazine in San Francisco, as part of his past contribution to society. He will indeed continue to offer his services whenever possible, through positive artwork, and teaching programs to those less fortunate. He is a very responsible person and a hard worker.

I ask that the court be lenient in sentencing him, as he is fully aware of how to conduct himself in the community from now on. He has strengths that the community will benefit from, and it is necessary for him to remain in free society for the community to get the benefits of his strengths.

Thank you for your attention to this matter.

Juliana Miller

Juliana Miller

Daniel Meyers
64, rue Rambuteau
75003 Paris FRANCE
danielsmeyers@hotmail.com

Paris, January 15, 2008

Re: Diallo McLinn
To whom it may concern,

I met Diallo, through his mother, in 1981 in Berkeley when he was only 9 years old. I was 21 years old and going to school at UC Berkeley. I became like a big brother or uncle to him. I was working my way through school doing construction and remodeling work and from an early age Diallo would help me during the summer or weekends to earn some extra money. From his late teens and into his twenties, he worked more regularly for either me, or one of my friends in the construction business. When he turned 18 and graduated from high school I took him on a trip to Mexico for two weeks as a graduation gift. We kept in close contact until 1994 when I moved to New York and then on to Europe in 1996 where I make documentaries for European public television. Through regular trips back to the bay area, I continue to keep in touch with Diallo.

Today, Diallo still has much of the innocence and kindness of when I first knew him. He is full of enthusiasm for his many projects, most of which are in the area of graphics, video and photography. Diallo has had his share of difficulty over the years. It wasn't easy to be raised by a single mother and he has spoken to me of his disappointment in his father who he has seen only occasionally over the years. But despite this experience, when Diallo himself became a father he reacted very differently. When he was 21 years old he had a daughter, Amber. The mother was not up to raising a child, she soon left and Amber was eventually adopted by a family. But Diallo's did not abandon Amber. He has not only kept in touch with her over the years, but they have a close and loving relationship. The last time I saw Diallo last December, he was together with Amber and it was so obvious how she looks up to him and how they adore each other.

There is no question that Diallo has made personal mistakes during his life. We all have. But now, through a very bad choice on his part, naivety, or the bad influence of others, the current charges against him force him into a major life turning point. Does his current situation motivate him, with the help of those close to him and that of the appropriate administrations, to really get his life together - to complete his university degree, improve his occupational skills and to accomplish some of his dreams?

I sincerely believe that he, and those close to him, are prepared to make this moment in his life an opportunity for positive change, and I believe that means outside of prison. Outside, he can continue with his life and do something constructive in his community, and he can continue being a good father to his daughter, Amber.

Daniel Meyers

Daniel Meyers

# EXHIBIT B

CHILDREN'S HOSPITAL MEDICAL CENTER
51st & Grove Street, Oakland, California 94609

**CLINICAL SUMMARY**

Admitted: 10-8-72
DATE: Dictated: 10-9-72
SUMMARIZED BY: Sid Frank, M.D.

NAME: McLinn, Imani
UNIT, No.: 222638
BIRTHDATE: 2-14-72

ADMISSION SUMMARY &
INITIAL HOSPITAL COURSE

This is the first Children's Hospital admission for this 8-month-old Black male.
Chief complaint was seizures.

HISTORY OF PRESENT ILLNESS: Patient was in apparent good health until 1 hour prior
to admission, when he had general seizure activity, followed by post-ictal state. He
was taken immediately to Herrick Hospital and was found to have abnormal neurologic
state with seizures and depressed state of consciousness. An LP was performed at
Herrick Hospital, and fluid appeared grossly clear and was found to be under extremely
high pressure. Patient was immediately transferred to Children's Hospital.

On admission, the child was found to be having seizure activity. Significant physical
findings were left retinal hemorrhages, left ptosis, bilateral clonus, right facial
paralysis and hyperreflexia with bilateral Babinskis.

Neurosurgical consult was immediately obtained. Patient was begun on I.V. therapy.
Bilateral subdural taps were then performed by Dr. Taekman, the neurosurgeon.
Approximately 20 cc. of bloody fluid was obtained from the left subdural space. The
right subdural space was clear. Patient showed immediate response to this procedure
with increased level of consciousness, absence of seizures, improvement of the ptosis
and the right facial paralysis. Skull x-rays obtained at that time were negative for
fractures. Later reading indicated possible spreading of the posterior sutures.

Examination of the subdural fluid at that time revealed a total white count of 3100
and total red count of 988,000. Spinal fluid examination revealed 7 white cells and
1600 red cells, within normal sugar and protein.

Patient's status at that time was stable and it was decided to follow the patient with
serial subdural taps.

The impression:  1.  Acute subdural hematoma, left.
                 2.  Rule out battered child syndrome.
                 3.  Anemia.

Initial hemoglobin was 6.6 Gm., with a hematocrit of 23, and peripheral blood smear
revealed marked hypochromia and anisocytosis, the feeling at that time being the
etiology of the anemia was chronic on the basis of iron deficiency, and acute on the
basis of intracranial bleeding.

On the morning following admission, the patient's overall status was stable, the
hemoglobin hematocrit remained stable at 6, hemoglobin, 21 hematocrit. The patient's
neurologic status and vital signs also remained stable. A bone survey was ordered, and
revealed fracture of the distal ulna and radius on the left, with soft tissue swelling
still present and no callus formation.

McLinn, Imani                                                      2.

A conference was held with the mother, babysitter, babysitter's girlfriend, Drs. Goldman and Frank, and Joanne Cook of Child Trauma Center. The legal requirements and our general impression was reviewed, and steps are now being made to contact Probation and Berkeley Police Departments.

It was also decided that we would transfuse the patient at this time because of the tenuous state of the patient and evidence of ongoing subdural bleeding. The patient will be retapped later in the day on both subdural spaces and will be followed closely with neurosurgical consultation.

Our impression at this time is strongly supportive of trauma to this child. The source of this trauma will be difficult to determine at this time because of the number and variety of people associated with the child's household. However, we do feel strongly that complete evaluation of the home setting must be made at this time.

                                   Sincerely,

                                   Sid Frank

                                   Sid Frank, M.D.

cl

from x-rays, appears to be some 5 days old. The break occurred almost certainly no later than that.

Within the scope of the definition of the battered child syndrome, the radius and ulna in general, did not enter into the theory. Due to the fact that when most parents grab their child by both shoulders or the upper arm, to shake them, very seldom is the lower arm injured. There is insufficient leverage of the lower arm, and in the case of a small infant, insufficient muscular structure to allow a severe enough shaking motion to tear the bridging veins or cause sufficient motion of the brain to tear these veins. It is unknown exactly what situation the break of the lower arm and damage to the bridging veins would have occurred.

I was also informed that the child had a low hemoglobin count. This was explained to me by the doctor as being a result of the blood escaping into the cranial cavity, causing the hemocritic count to go down w/the loss of blood from the actual circulation in the blood stream, causing the infant's blood count to down from 45, the normal infant hemocritic count, to 21.

At this time I asked the Chief Resident if he actually thought we had a child abuse case. He informed me that due to the sub-dural hematosis and radiula and ulnal break, from his estimation, we have a child abuse case. He states to this officer that in the opinion of 9 out of 10 doctors, that 90% of them would say that the child had been battered in some way.

I then proceeded to interview the mother at length, to find out the child's history and their relation w/him.

From the mother I find the child has no history of ill health, either mental or physiologically. He has no abnormalities. Further I find that the father of the child, MC LINI, has abandoned him, and that Jamy Sheridan, the child's stepfather, has taken over all the fatherly duties. Tradicionally, step parents and children do not get along too well. Although, we are not dealing in fact here, only a very broad unsubstantiated generalization. I asked the mother where she lived and she stated she lives at 1620 Harmon St. This address, I find is a residential home, where the residents live communally. I asked if there were any other children in the house who might possibly have played w/the victim in this case and injured him. I was informed there were no other children in the house, only 3 adults, which are listed as follows:

1. STEPHANIE STAR WALMSLEY, WFA-27.
2. ROSEMARIE (IMI) HOFFMAN, WFA-25.
3. The third party in this house has just moved in w/them the last 36 hours, and could not possibly be involved in this offense or have any knowledge or history of the inter-action between persons in the house.

The child's babysitter is MARY K. HAMACHEK, 2521 Piedmont, WFA-26, 548-1193. According to the mother, the babysitter Hamachek, "loves the baby" thus indicating that the babysitter would never do the child any harm. However, this is only the feeling of the parent, and I do not believe this person should be completely ruled out of the picture. Nor do I believe that in a

IMANI (IMI) MC LINN                          10-9-72                    59371-72

At 1549 hours, 10-9-72, IMANI (IMI) MC LINN, has been reported by Children's Hospital Child Abuse Center Social Worker, JOANNE COOK, to be victim of possible child abuse by her parents. JAMY (IMI) SHERIDAN (stepfather), WMA, DOB: 9-27-48, 1628 Harmon, 655-0848, and his wife, the child's mother, DONNA V. ALLEN, WFA, DOB: 11-2-48, same address and phone number, time prior.

It was requested that I respond to Children's Hospital, 52nd & Grove Sts., Oakland, to investigate a possible child abuse case. I was to speak to Social Worker Joanne Cook, re an injured child, Imani Mc Linn. However, before talking to the Social Worker, I went directly to the ICU (Intensive Care Unit), where the child was being held. I talked to the nurse attending the child and she suggested I talk to the Chief Resident Physician. At this time I contacted the mother, who was near that child, and asked her in essence what the problem was. She informed me she did not know why the child had taken ill. She explained that possibly the child had fallen upon his head or injured himself in some way and that this had caused convulsions.

At this time I decided that I should examine the child for bruises, cuts, contusions, swelling, and any apparent abnormal swelling. I did this, and found nothing out of the ordinary. The child, Imani, DOB: 2-4-72, 1628 Harmon. In touching this child, I found no particularly sensitive places. The child was being fed intravenously and his head was bandaged due to the fact his skull had been tapped for fluids earlier in the day.

After this initial examination of the child for external problems, I talked to the Chief Resident & Consultant to the Child Trauma Center, DR. JAY GOLDSMITH. He informed me, from looking at the chart, which was originally taken by DR. SIDNEY FRANK, that there is a sub-dural hematoma. This sub-dural hematoma is caused by a contra-coupe motion of a child's head. This contra-coupe motion is a back and forth motion of the head, which causes the child's brain to move around in the fluid of the brain, causing damage to the very sensitive capillaries going to the brain. These capillaries then hemorrhage, causing blood to seep into the brain cavity. This extra fluid then causes pressure which eventually causes convulsions, as is exemplified by our little victim. The condition that I have just spoken of, is caused by torn bridging veins, causing a collection of blood, which eventually causes convulsions. The staff at tha hospital is now treating this via releasing the pressure on the brain, by tapping the coagulated blood from the cavity. The contra-coupe motion that I mentioned before, as I remember, is commonly called the "shaking syndrome" and "the battered child syndrome."

The fact that the child is suffering from sub-dural hematosis, is not in itself sufficient to establish that the child has been battered. Many children become victim of sub-dural hematosis by falls and other early childhood activities. However, our victim also suffered from a fracture of the radius and ulna. If one is not familiar w/these two bones, this is simply both bones of the lower arm. This break of the radius and ulna,

IMANI (NMI) MC LINN                    10-9-72              59371-72

communal living situation that the possibility that one of the other persons in the house, not knowing the consequence of their action, may have become overly physical w/the child and done him serious damage.

The mother also related to this officer that the stepfather took the child on an archeological dig, in more or less, rough terrain. The child was in an aluminum back pack type of child carrier. I asked the mother whether she knew that if the child's neck muscles and muscular structure in general is not developed sufficiently that a back pack can do serious if not irreparable harm. The motion, as an individual is walking along, creates the "contra-coupa" type motion that was mentioned earlier in this report. Thus, doing damage to the child. Also the child reportedly banged his head against the aluminum frame on the pack several times.

The mother also informed this officer that the child has been attempting to stand up recently, and has fallen many times. The parents suggested that this might possibly be the reason for the damage done to the child's head. This, too, is not outside of the realm of possibility.

Here I talked to the Social Worker Cook, and she informed me that the parents have no past record of any such type of offenses as child abuse. Nor do they have any history of battery on each other or their fellow members of their commune. However, the social worker believes that these parents were attempting to raise their child as per recommendation of Dr. Spock and were allowing the child to cry at liberty. In the social worker's opinion, this crying may possibly have annoyed the parents or one of the tenants of the household and they may have become overly vigorous w/the reprimanding of the child. Further she states that because of the break of the arm and sub-dural hematosis, that the child may have battered. Although she believes as do I, that at this time attempting to file charges for child abuse would be fruitless effort. I have attempted to talk to the other members of the commune w/negative results. I have checked filed here and find nothing pertinent to this case. I have also put a police hold on the child, and the child cannot be released w/out our consent. The child's parents understand what this is about and are not disturbed by it.

FU:   10-16-72 by Sgts. 2nd

CC:  Butler, Sgts. 2nd, Templeman, JB-2      D. E. BUTLER #36
                                            10-10-72   0130 hours

gs/10-10-72

# EXHIBIT C

# DOCUMENT SUBMITTED UNDER SEAL

EXHIBIT D

**Osha Neumann**
Attorney at Law
1840 Woolsey Street
Berkeley, California 94703
(510) 644-2429

March 24, 2008

Magistrate Judge Wayne D. Brazil
United States District Court
1301 Clay Street
Oakland, CA 94601

    Re:  Diallo McLinn
    Case #: 07-70574

I am writing to urge you to exercise the utmost leniency within your discretion in sentencing Diallo McLinn.

I have known Diallo since he was four years old. I've known his mother, Arisika Razak, for the same amount of time. We were married 15 years ago.

I am aware that Diallo has pled guilty to misdemeanor aiding and abetting the possession of marijuana. When he was first taken into custody by DEA agents I rushed to the scene and saw him sitting in handcuffs by an open door with a look of utter desolation on his face. He was released by the court into our custody and has lived with us since then. He has been scrupulous in abiding by the conditions of his release and I am sure he will be equally scrupulous in abiding by any conditions of probation you may impose.

I know that Diallo feels deep remorse not simply for breaking the law, but also for the pain and worry he has caused his mother. They are very close.

To understand Diallo, it is important to know something of his history. When he was eight months old he was left briefly in the care of Ms. Razak's partner at the time, Jamy Sheridan. She was away at a conference in Oregon. The day she left Mr. Sheridan threw Diallo against a wall. He went into seizure and was rushed to Children's Hospital. He was moribund upon arrival. Doctors determined he had two subdural hematomas and a hairline fracture of the forearm. They opened his skull to relieve the pressure. He was in the hospital for about a month. For a time he was partially paralyzed. Gradually he recovered. But he had suffered a traumatic brain injury that has affected his entire life.

A referral was made to Child Protective Services. Mr. Sheridan claimed Diallo had fallen, or been hit by a door. The case was dropped. Months later, in therapy, he admitted what he had done.

1

Diallo was diagnosed when he was in school with significant learning disabilities. I have observed that he seems to experience almost physical pain when asked a question he finds difficult, or is required to process too much information. He has struggled through a series of low-paying service jobs, waiting tables, working in the stock room of a printing company; doing a little freelance graphic design. He's gone through periods where his phone is turned off for lack of payment and periods of homelessness. He has been victimized by people he thought were his friends and believed in their moneymaking schemes that ended up going bust. Because he does not trust his own judgment he seeks out people whom he thinks know better than he how the world works and relies on them.

I offer just one example of his propensity to consider everyone his friend. The DEA agent who had taken him into custody was in court on the day of his arraignment. At the conclusion of the court proceeding we all went out into the hall. I looked around and there was Diallo standing with the agent, wearing a big smile and shaking his hand as if he was his best buddy. The lawyer in me cringed, but it was pure Diallo.

Diallo is not simply a wounded victim. I absolutely do not want to give that impression. He is a sweet, kind, gentle, guileless human being. He is absolutely without a trace of meanness. He is an artist, who has spent hours since he began living with us in September perfecting his skills at computer graphics. True to his nature, he is generous in sharing his skills. He has given many hours to an organization in San Francisco that helps the homeless and women on welfare publish their memoirs, poems, and short stories.

He is also a loving father to his daughter, Amber. Her mother and he made the decision to give her up for adoption at birth. She had been conceived in a brief one night stand and neither of them was in a position to provide her a home. Her mother disappeared from her life, but Diallo and Amber have maintained a relationship that has deepened over the years. She is now 13 years old and one of the great pleasures of my life is seeing them playing and laughing together.

I believe Diallo has learned his lesson. I thank you for all the care and consideration you will use in determining his sentence.

Very truly yours,

Osha Neumann

2

# EXHIBIT E

March 31, 2008

Magistrate Judge Wayne D. Brazil
United States District Court
1301 Clay Street
Oakland, CA 94601

          Re:     Diallo McLinn
          Case #:  07-70574

I am writing as the mother of Diallo McLinn, who has plead guilty to a misdemeanor charge in regards to aiding and abetting the possession of marijuana. I have known Diallo all of his life and I believe that he deserves to be considered with fullest leniency by the Court in regards to his sentencing.

Over the years, I have watched Diallo evolve from a gentle, caring, and adventurous child to a committed and loving father, and a dedicated and talented graphic artist and photographer. In spite of the abandonment of his father and step-father, he has managed to become a caring and committed individual who can make long term commitments to his friends and partners. Unlike many men, he is emotionally supportive to both women and men, and he has provided physical and emotional assistance to numerous individuals over the last sixteen years of his life.

He has struggled all his life with what I believed to be a learning disability, and perhaps because of this he has chosen to be an artist. He only realized about six years ago that the brain injury that he received as an infant was not due to an accident but was instead inflicted by his step-father Jamy Sheridan. Jamy had initially denied having any connection with this injury which occurred while I was out of town. He indicated that he had walked into Diallo's room and found him having a seizure. He immediately took him to the hospital. Medical personnel confirmed that Diallo's injuries were life-threatening and I was later told that Jamy's quick response had saved Diallo's life. I accepted this as true, only to learn a year or so later in couples' counseling that it was actually Jamy's actions that had caused Diallo's injuries.

In spite of this initial injury, and, I believe, because of the skillful counseling we received, Jamy was a safe and effective parent for the next seven years. Even after we separated, Diallo continued to have a room in Jamy's house and he spent approximately half of his time with Jamy and half with me. While Diallo knew that he had been injured as an infant, I was reluctant to inform Diallo that this injury was caused by Jamy, since there was a clear bond between them, at least on Diallo's side.

1

At the age of ten, three years after we separated, Jamy told Diallo that he was re-marrying and that he no longer wanted to be called "Dad". He told me that he wanted to be treated as a "friend of the family", ended Diallo's visits, and effectively abandoned Diallo.

Diallo accepted this – but he continued to interact with Jamy whenever he could. Jamy is an artist and in Diallo's application to the California College of Arts and Crafts, he credited Jamy with inspiring him to be an artist. Over the course of many years I struggled with what and how much I should reveal to Diallo. Finally, I decided that he had a right to know the truth. In these two cases, in spite of the grief or anger that these events may have caused, Diallo never acted out in violent or negative ways. Demonstrating a wisdom that extended beyond his years, Diallo indicated that these events were in the past and could not be changed – his task was to move forward and live his life in the best way that he could.

Perhaps because of his lack of connection to his biological father and his step-father, Diallo has been extremely committed to his relatives and his friends. He has a strong relation with his cousins on both sides of the family, and he has been a loyal friend. He has worked in a number of entrepreneurial ventures with buddies that he met in college – doing everything from selling hats, photographing models and aspiring models, and more recently staffing a Federal Express route.

He is not afraid to do hard work: he had a newspaper route as a teen-ager and he did construction work for several years with Daniel Meyers who was the son of a friend of mine. During his high school years I worked full time as a nurse-midwife for Highland Hospital and whether I was home when he woke up or not, he regularly got up, prepared himself for school and traveled to San Francisco where he attended Urban High School.

Over the years, I have been puzzled by his frequent changes of jobs. He would work at a place for two or three years and then leave. He was never fired. Sometimes he felt slighted – in one case, he felt he had been passed over for a managerial position in a printing outfit and then was asked to train the new manager. In other cases, he felt that his day job interfered with his work as a free-lance photographer, videographer, and graphic artist. At other times, he left a job in order to support an entrepreneurial venture that his friends were initiating.

While in elementary school, Diallo was initially tested, diagnosed and treated at Raskob Institute in Oakland for a learning disorder. However I was unable to engage in long term systematic follow-up. I knew that he had problems that may have stemmed from the severity of his brain injury as an infant, but I was unaware of the emotional sequelae that are often the consequences of traumatic brain injury. In my recent conversations with psychologists and counselors as a result of this misdemeanor charge, I have come to understand that Diallo's trusting nature, and lack of guile may be a result of this early injury.

In conversations with me, Diallo has also indicated that my own grande mal seizure after a week-end of being on call and up all night was a very.significant factor in his life. He

was the one who, on the morning that he was scheduled to go to summer camp, came upstairs and found me seizing. He called an ambulance which took me to the hospital. He was taken to the camp pick-up site by my room-mate, and he spent the week not knowing what the outcome of my seizure would be.

I feel that I now know more about the complex person who my son is. He is a *good* person. He is not self-centered or narcissistic; he cares deeply about people and he wants to make a contribution to the world. He is deeply committed to Amber, his fourteen year old daughter who is in an open adoption arrangement. While Amber has not seen her mother since she was one year old, she has grown up knowing that Diallo is part of her life. He is in contact with her once or twice or week; and he takes her out three to four times a month. Last year they went to New York together to visit with his biological father's family. When he considered the prospect of incarceration, he indicated that separation from his daughter would be a great loss to him.

I feel committed to work with him so that he may better understand his challenges and his gifts and find the professional support that will enable him to maximize his abilities. He has successfully met all the conditions of his pre-trial requirements: his drug tests are negative; he has met residency requirements; he is legally employed; he has accepted Court supervision. He has shown remorse for his acts, and understands the consequences that they can bring. He is strongly connected to his family and community.

I ask that the Court show leniency to my son Diallo.

Sincerely,

Arisika Razak

3